UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

MICHAEL H. and WANDA HOUCK

    Plaintiffs,

vs.                                    CASE NO:

RAPAC, L.P.,
a Tennessee limited partnership,
RING CORPORATION,
a Tennessee corporation,
EZFLOW, L.P.,
a Tennessee limited partnership,
and WAVERN L. GARNER,

    Defendants
_____/

## COMPLAINT

Plaintiffs Michael H. Houck and Wanda Houck bring this action against Defendants Rapac, L.P., Ring Corporation, EZFlow, L.P., and Wavern L. Garner for declaratory judgment, for correction of inventorship pursuant to 35 U.S.C. § 256, and to vacate an arbitration award pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 10(a) and 11, and in support alleges:

## Parties and Jurisdiction

1.    Plaintiffs and Defendants Ring Corporation and EZFlow, L.P. are parties to an asset purchase agreement concluded on March 15, 2000.

1

2. On June 3, 2010, Plaintiffs filed an arbitration complaint with the American Arbitration Association ("AAA") alleging that Defendants Ring Corporation and EZFlow, L.P., had improperly failed to pay installment payments due them pursuant to that assert purchase agreement.

3. During the course of discovery in the AAA arbitration proceeding, Plaintiffs confirmed that a former employee of Defendants, Defendant Garner, had submitted a patent application to the United States Patent and Trademark Office that was based, in part, on specifications and other information provided by Plaintiff Michael Houck. That application led to the issuance of United States Patent No. 6,467,996 to Defendant Garner on or about October 22, 2002 (the "'996 Patent"), which patent is now owned by Defendant Rapac, L.P.

4. The '996 patent was wrongfully issued solely to Defendant Garner. Plaintiffs accordingly seek appropriate declaratory relief, as well as relief pursuant to 35 U.S.C. § 256 and an accounting.

5. Plaintiffs Michael H. and Wanda Houck (sometimes referred to as "the Houcks") are residents of Dubois, Wyoming.

6. Plaintiff Michael H. Houck ("Mr. Houck") is by occupation and background a prolific inventor in the field of wastewater treatment as it relates to alternative drain field technology. Mr. Houck has been granted a number of United States utility patents and has many other patent applications in prosecution. He has spent nearly his entire adult life as an innovator and operator in the field of onsite wastewater technology.

7. Mr. Houck was once one of the owners of EEE ZZZ Lay Drain Co., of Brevard, North Carolina (hereinafter EZL), as well as the owner of a number of patents under which EZL was licensed.

8. Plaintiffs own all of the remaining rights and assets of EZL.

9. Defendant Rapac, L.P. is a Tennessee limited partnership and maintains, upon information and belief, its principal place of business in Oakland, Tennessee.

10. Defendants Rapac holds record title to the '996 Patent.

11. Rapac is a supplier of beads to various manufacturers and, on information and belief, regularly conducts business in this Division and District and regularly supplies the beads which are the subject of the '996 patent to manufacturing plants in North Carolina.

12. Defendant Ring Corporation is upon information and belief a Tennessee corporation whose principal place of business is located in Memphis, Tennessee.

13. Ring Corporation controls and, on information and belief, is the general partner of Rapac, and also regularly conducts business in this district and division.

14. Upon information and belief, Defendant EZFlow, L.P. (sometimes called *EZflow)* is and at all times material to this action has been a Tennessee limited partnership.

15. Until a sales transaction with a company called Infiltrator, EZ*flow* was controlled by Ring Corporation and was operated by it as simply one among many affiliated companies owned by Ring Corporation.

16. Defendant Ring Corporation was the General Partner of EZ*flow* during the aforementioned time period.

3

17. Defendants Rapac, EZ*flow* and Ring Corporation are each subject to personal jurisdiction in this district and division.

18. Defendant, Wavern L. Garner is, on information and belief, a resident of Savannah, Georgia.

19. Mr. Garner was, at all times material to this action, an officer or employee of Rapac.

20. This Court has jurisdiction of the present action because it arises under the patent laws of the United States (28 U.S.C. § 1338, 35 U.S.C. § 256) and under the Federal Arbitration Act 9 U.S.C. §§ 10(a) and 11. Plaintiffs also seek a declaratory judgment to settle an actual controversy between the parties (28 U.S.C. § 2201, 2202), along with supplemental relief.

21. Venue lies in this District and Division because substantially all of the actions arising out this dispute, including the inventive activity at the heart of this case, occurred here and the causes of action asserted herein arose here.

22. All conditions precedent to the filing of this Complaint have been performed or are excused by law.

### Count I
### Vacation of Arbitration Award
### Pursuant to 9 U.S.C. § 10(a) and 11

23. This is a claim against all Defendants but defendant Garner to vacate an arbitration award entered on July 6, 2011 in AAA arbitration Case No. 30 489 00431 10 (the "Award" attached as Exhibit "A").

24. Plaintiffs reallege the allegations of paragraphs 1-22 and incorporate them by reference into this Count I as if fully set forth herein.

4

25. The arbitration case was brought by Plaintiffs Michael and Wanda Houck to collect underpayments of installments due on the asset purchase agreement between the parties.

26. Under that agreement, the Houcks and their company EZL conveyed and sold to EZ*flow*, of which Ring Corporation was then general partner, substantially all of the operating assets of EZL, including manufacturing equipment, inventory, customer lists and related customer information, permits issued by regulatory agencies for the installation of their technology, and specified intellectual property. (Asset Purchase Agreement, §§ 1.8, 1.10, 1.11, 2.1, and 2.2).

27. In return for the Seller's assets, Ring Corporation and EZ*flow* paid the Sellers an initial payment, defined in the Asset Purchase Agreement as the "Cash Portion." EZ*flow* also undertook to pay the Sellers in installments thereafter, the installment payments being defined as the "Installment Portion." (Asset Purchase Agreement § 2.4.)

28. The Installment Portion "of the Purchase Price" is payable in monthly installments computed at the rate of a specified percentage of Net Sales (a defined term) for a period of years. For the first eight years beginning with the Closing Date, EZ*flow* was obligated to pay Michael and Wanda Houck 4% of its Net Sales of Products. Thereafter, EZ*flow* was required to pay the Houcks 1% of such Net Sales "for the term of ten (10) years beginning with the eighth anniversary of the Closing Date." (Asset Purchase Agreement § 2.4 (c) (ii)). These Installment Portion payments are referred to hereinafter for ease of reference only as "Installment Payments."

5

29. Paragraph 1.19 of the Asset Purchase Agreement with the Houcks defines "Net Sales" as "the gross sales price (inclusive of Freight) in a normal arms-length transaction to a bona fide purchaser for value for all Products sold, licensed or otherwise transferred by Purchaser or any affiliate or licensee of Purchaser, less any allowances for cash discounts, other trade or quantity discounts, credits for return to stock, credits given under warranty, credits given for replacements, credits or write-offs due to bad debts after commercially reasonable collection attempts and, if separately stated, any sales, use, excise, value added or other similar tax levied on the gross sales price of the Products." (Emphasis added).

30. The Houcks were led to believe, and did believe, that Ring was fully compliant with its continuing obligations under the Asset Purchase Agreement. The Houcks had no reason to dispute the size of their monthly Installment Payments or the accuracy of Defendants' statements and reports.

31. On December 1, 2009, the Houcks demanded an audit to determine whether Defendants were indeed properly accounting for his monthly Installment Payments. This audit was demanded through counsel because of issues created by prior audit requests.

32. Plaintiffs eventually served notice that they would pursue arbitration to enforce their audit rights after Defendants continued to withhold production of the documents showing how installment payments were actually calculated. Defendants acquiesced and served a set of documents for review by Plaintiffs' accountant. Defendants' initial financial document production revealed that Defendants had improperly calculated the Houcks' monthly Installment Payments for the entire contract

6

period. Defendants had improperly withheld installment payments on couplers, fabric, treatment systems, and freight charges amounting to several hundred thousand dollars in payments since March 15, 2000.

33. Plaintiff filed a demand with the American Arbitration Association on June 6, 2010 (attached as Exhibit "B"), seeking a full audit and damages related to underpayment of installments.

34. Defendants presented a defense that the APA did not require them to base the installment payment on the sale all products, even those products that had been previously sold by EZL prior to the asset purchase. This defense was based on the opinions of patent attorney Daniel J. Warren, who was offered as an expert in contractual interpretation and patent licensing issues, the ultimate issues of law for determination of the panel.

35. Shortly before the final hearing on Plaintiffs' claims, it was discovered that Mr. Warren had previously worked at the same law firm as AAA panel chairman David Leonard. In a subsequent deposition, Mr. Warren admitted that Mr. Leonard had been his supervisor and that they had worked on several cases together.

36. Plaintiffs strenuously objected to Defendants' reliance on a "legal expert" who had previous close professional ties to the chairman of the arbitration panel. Plaintiffs also objected to Mr. Warren's opinion testimony on questions of pure legal nature that effectively amounted to an opinion on how the panel should decide the case, testimony that was in direct conflict with relevant Federal Circuit case law.

37. The AAA rejected Plaintiffs' request to remove Mr. Leonard, despite the evident attempt by the Defendants to bias the panel by offering legal opinion through a

close former associate of the panel chairman. Plaintiffs were left with little choice but to move the panel to strike Mr. Warren's testimony, the same panel chaired by Mr. Warren's supervisor. Plaintiffs' efforts to strike Mr. Warren colored the panel's opinion of Plaintiffs case and made a fair hearing impossible. Indeed, one panel member stated on the record that he found Plaintiffs' objection to Mr. Warren "distasteful."

38. Mr. Warren was permitted to testify on ultimate questions of law during the hearing.

39. After the conclusion of the hearing, the AAA panel ruled against Plaintiffs on all its damages claims. Indeed, the panel even denied recovery of freight, which Defendants had admitted that they had failed to pay and was covered by the APA.

40. Defendants' reliance on Mr. Warren placed Plaintiffs in the untenable position of either objecting to Mr. Warren's improper testimony and raising the ire of the panel, or losing their available remedies under the FAA.

41. The panel's evident partiality is supported by the panel's reaction to Plaintiffs objections and the subsequent Award based on Mr. Warren's improper testimony on issues of contractual interpretation.

42. Moreover the panel's partiality is apparent from the award decision, Exhibit A, which declined to follow contract law principles or ordinary rules of patent construction, but instead simply made a biased decision in favor of Defendants.

43. Plaintiffs were deprived of a fair hearing on the evidence due to the evident partiality of the AAA panel.

WHEREFORE, the Plaintiff prays that:

A. The Court vacate the AAA panel's Award;

8

Case 1:11-cv-00195-MR-DLH    Document 1    Filed 08/05/11    Page 8 of 16

B. That Plaintiffs' case be remanded for a fair hearing on the actual merits of the case by a neutral arbitration panel.

C. Such additional relief as the Court deems just and proper.

## Count II
### Correction of Inventorship of U.S. Patent No. 6,467,996
### Pursuant to 35 U.S.C. § 256

44. This is a claim by Plaintiff Michael Houck against all defendants for correction of inventorship pursuant to 35 U.S.C. § 256.

45. Mr. Houck realleges the allegations of paragraphs 1-22 and incorporates them by reference into this Count II as if fully set forth herein.

46. Each of the Defendants owns an interest in or is a necessary party to the correction of the inventorship of the '996 Patent.

47. Mr. Houck and his brother Randall Houck are the inventors of the Houck Drainage System involving the manufacture and installation of preassembled drainage line units for use in, among other applications, septic drain fields, as claimed in various Houck patents including: 5,378,357; 5,535,499; 5, 639,364; 5,657,527; 5,154,543; 5,051,028; 5,015,123; and CA 2 037 617 (Canadian Patent). A representation of the preassembled drainage line unit for installation in a Houck-type drainage field is shown below:

9



48. The Houck preassembled drainage line unit was an important improvement over then-existing gravel drain field technology because, among other things, the Houck preassembled bundles could be easily transported to the drain field location for efficient installation, substantially decreasing septic system drain field labor and material installation costs.

49. During or about 1997 representatives of Rapac approached Houck about supplying polystyrene beads for use as aggregate in the EZL products Mr. Houck was then supplying to his customers.

50. Defendants offered to assist in the development of a specific aggregate bead which would possess the characteristics, void space, and specific geometry that would meet Mr. Houck's specifications and which would be highly suitable for use in the new Houck preassembled drainage line unit technology.

51. Mr. Houck agreed to collaborate with Defendants in connection with the design of a suitable polystyrene bead product, which entailed consideration of many factors such as the shape, formulation, extrusion, and expansion of the ultimate polystyrene product.

10

52. Thereafter the parties began collaborating in the design of a product in Brevard North Carolina, where Mr. Houck's main manufacturing plant was located, and to a lesser extent in Atlanta, Georgia and Oakland, Tennessee.

53. Representatives of Mr. Houck, Mr. Houck himself, employees of Rapac, and employees of Ring and various Ring affiliates all made substantial efforts toward the design, testing and development of a suitable bead product during the period 1997 and 1998.

54. Mr. Houck supplied the specifications for the bead, assisted in the design of the bead, and evaluated the efficacy of each design.

55. After extensive testing of prototype beads a trial of the bead occurred in Brevard, N.C., at Mr. Houck's plant. Mr. Houck determined that the prototype was too small and expensive to make.

56. Mr. Houck Rapac, and Ring Corporation thereafter collaborated on the design of a new bead and new bead geometry. This resulted in a new prototype that was tested at Mr. Houck's plant in Brevard, North Carolina, on or about March 1998. A key element of the testing at Mr. Houck's plant involved how the prototype beads could be fed into a manufacturing apparatus for the high speed creation of Mr. Houck's preassembled drainage line units.

57. Mr. Houck's work on the testing of the bead and on methods of manufacture of them led to his conception and reduction to practice of an invention relating to how the beads could be manufactured. This led to the filing of an initial patent application on July 30, 1999, and eventually to the issuance to Mr. Houck and his co-

11

worker, Thomas K. Weaver, of US Patent 6, 497, 031 B1, entitled "Apparatus for Manufacturing Drainage Line Units and Associated Methods."

58. The continued design and testing of various bead prototypes extended into about May and June 1998. That testing in turn produced an agreement among Mr. Houck and Defendants in Brevard North Carolina relating to the ultimate design and geometry of the bead that Rapac would supply to EZL.

59. The agreement also led to the construction of a plant in Brevard North Carolina for the manufacture of the bead and a supply agreement between Mr. Houck's company, EZL, and Defendants.

60. The ultimate characteristics of the bead design resulted from the collaboration of many individuals, including Mr. Houck and Michael Lloyd, then an engineer of Rapac, and the monetary, creative and physical resources of multiple companies including EZL, Rapac and Ring.

61. Thereafter Ring Corporation approached Houck regarding a purchase of the EZL business and patents. After a period of negotiation, the assets of EZL were sold to Ring Corporation on or about March 15, 2000, the latter taking title to those assets through a Tennessee limited partnership formed for that purpose.

62. The asset purchase agreement between the parties provided for installment payments based on revenues generated by the Houck technology.

63. Unbeknownst to Mr. Houck, Defendants and their affiliates and employees had secretly applied for a patent directed to the final polystyrene bead aggregate on or about April 8, 1999.

64. United States Patent No. 6,467,996 (the "'996 Patent") entitled "Polystyrene Beads for Drainage Fields" did not issue until Oct. 22, 2002. A true and correct copy of the '996 Patent is attached hereto as Exhibit "C."

65. Defendant Garner is the sole listed inventor of the '996 Patent.

66. Plaintiff Houck was instrumental in the invention of the technology claimed in the '996 Patent.

67. Mr. Houck made substantial contributions to the independent claims of the '996 Patent.

68. Because Houck substantially contributed to the conception and reduction to practice of significant features of one or more of the claims of the '996 patent, he is necessarily a co-inventor of the '996 patent.

69. Upon information and belief, the omission of Mr. Houck as a listed inventor of the '996 Patent was the result of error and did not arise from any deceptive intention on the part of the patent applicant.

70. Sometime after the '996 Patent issued, Mr. Houck learned that Defendants had obtained a patent directed to bead technology but did not closely review the patent until 2010, because by then the assets of his company had been purchased by Ring Corporation and he had no reason to believe that the patent claimed technology on which he had made contributions.

71. More recently in 2010, however, Mr. Houck had the occasion to review the scope of the '996 patent, as the result of the above-described arbitration proceeding. In that proceeding Ring Corporation prominently mentioned the '996 Patent and its former employees were questioned about the '996 Patent. Only at that point did Mr. Houck

examine the patent claims and appreciated that he had been incorrectly omitted from the list of inventors.

72. Mr. Houck then discovered for the first time that the patent was based on his substantial inventive contributions.

73. Mr. Houck thereafter investigated the circumstances of the invention and its timeline in detail in order to confirm his inventive contributions.

74. Mr. Houck has never assigned any of his rights in the '996 Patent to any person or entity.

75. Mr. Houck is a true and actual co-inventor of the '996 Patent.

76. Because Mr. Houck is rightfully a co-inventor of claimed features of one or more claims of the '996 patent, this Court should issue an Order directing the Commissioner of Patents to add Mr. Houck as a co-inventor of the '996 patent.

WHEREFORE, Plaintiff Michael Houck prays:

A. For a declaratory judgment that the '996 Patent was issued in error and without any deceptive intention on the part of Defendant Garner or anyone else; and

B. For a declaratory judgment declaring any assignment of the '996 Patent assigned by Defendant Garner and/or any other party prior to the issuance of such declaratory judgment null and void; and

C. For a declaratory judgment declaring any contract, agreement or other binding commitment by Defendant Garner with any third party which necessitates the manufacture, use or sale of the invention which is the subject of the '996 is null and void;

14

D. For a trial by jury on all issues so triable in this action;

E. For an Order from this Court to the Director of the United States Patent and Trademark Office to reissue a corrected patent that includes Mr. Houck's name to reflect co-inventorship with Mr. Garner;

F. For an accounting of the profits, if any, that Defendants earned as the result of the '996 Patent; and

G. Such additional relief as the Court deems just and proper.

### Count III
### Unjust Enrichment

77. This Count III is asserted as an alternative to the claim set forth in Count II.

78. Plaintiffs reallege the allegations of paragraphs 1-22 and 47-72 and incorporate them by reference into this Count III as if fully set forth herein.

79. To the extent Rapac and Garner deliberately omitted Mr. Houck as an inventor of U.S. Patent No. 6,467,996, Plaintiff Michael Houck asserts this claim for unjust enrichment as an alternative basis for relief.

80. If it is determined that Defendants deliberately omitted Mr. Houck as an inventor, the '996 Patent would be invalid and unenforceable and Mr. Houck would be unable to claim the benefit of his patent rights as a co-inventor due to misconduct of the Defendants.

81. Mr. Houck has not assigned his rights in the '996 Patent to any third-party.

82. Defendants Rapac and Garner have made no payments to Mr. Houck with respect to the '996 Patent.

83. Defendants Rapac and Garner, by improperly omitting Mr. Houck as an inventor of one or more claims of the '996 Patent have conferred a substantial benefit on themselves.

84. It is unjust for Rapac and Garner to retain the benefit of Mr. Houck's contributions and efforts without conferring any benefit upon Mr. Houck.

85. Mr. Houck has been damaged as a result and is entitled to compensation for the benefit conferred upon Rapac and Garner.

WHEREFORE, the Plaintiff prays:

A. An award of damages to the Plaintiff Michael Houck;

B. For a trial by jury on all issues so triable in this action;

C. Disgorgement of the profits of Defendants Rapac and Garner obtained as a result of their unjust enrichment;

D. Such additional relief as the Court deems just and proper.

Respectfully submitted this 5th day of August, 2011.

| | |
|---|---|
| */s/Stephen D. Milbrath*<br>STEPHEN D. MILBRATH<br>Florida Bar No. 0239194<br>DAVID W. MAGANA<br>Florida Bar No. 0041485<br>Lead Counsel<br>ALLEN, DYER, DOPPELT, MILBRATH<br>& GILCHRIST, P.A.<br>255 So. Orange Ave., Suite 1401<br>Post Office Box 3791<br>Orlando, Florida 32802<br>Attorneys for Plaintiff<br>Tel: 407/841-2330<br>Fax: 407/841-2343<br>smilbrath@addmg.com<br>dmagana@addmg.com | */s/ Brian D. Gulden*<br>Brian D. Gulden<br>N.C. Bar No. 29243<br>Local Counsel<br>Patla, Straus, Robinson & Moore, P.A.<br>Post Office Box 7625<br>Asheville, North Carolina 28802<br>Telephone: (828) 255-7641<br>Facsimile: (828) 258-9222<br>bdg@psrmlaw.com (email) |