AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal

Re:  Case No. 30 489 00431 10

In the Matter of the Arbitration between

MICHAEL H. and WANDA HOUCK,

    Claimants,

and

EZFLOW, L.P. and RING CORPORATION,

    Respondents.

---

**AWARD OF THE ARBITRATORS**

The undersigned Arbitrators, Taylor Tapley Daly, Joseph R. Manning, and David M. Leonard, having been designated in accordance with the provisions of the Asset Purchase Agreement[1] dated March 13, 2000, between EZflow, L.P., on the one hand, and Michael and Wanda Houck and EEE ZZZ Lay Drain Company, on the other hand, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby issue the following Award:

This proceeding was commenced with a Demand for Arbitration filed on

---

[1] The Asset Purchase Agreement's Paragraph 8.1, titled Resolution of Disputes, calls for resolution of disputes by binding arbitration conducted in Atlanta, Georgia.  Although the provision as written provides for one arbitrator, both parties in this dispute chose to have the dispute heard before a panel of three neutral arbitrators.  At the time of the initial scheduling order, the Panel confirmed this decision by both parties, as well as their decision to commence the arbitration proceeding without having yet at that time accomplished the face-to-face meeting provided for in Paragraph 8.1.

behalf of Michael H. and Wanda Houck in the Atlanta Office of the American Arbitration Association on June 3, 2010. The subject matter of the dispute involves the parties' conflicting interpretations of the obligations and scope of payments required by EZflow, L.P. to the Claimants, Michael and Wanda Houck, pursuant to the terms of the Asset Purchase Agreement ("APA").[2] The dispute was heard before the panel of three arbitrators on May 3, 4, and 5, 2011.

In summary, the Claimants contend that EZflow, L.P. and Ring Corporation owe additional funds in connection with the APA's obligation to pay installment payments to the Houcks in the years following the asset purchase. The dispute touches various provisions of the contract, but focuses on the definition of the term "Products," a term that forms the basis for the calculation of the Houcks' installment payments over time. These payments are based on a percentage of "Net Sales," a term that uses the gross sales price for all "Products" sold by the Purchaser, EZflow.

As stated in the APA, the Houcks were engaged in the business of manufacturing, producing, marketing, and selling certain products, "based upon certain Patents and manufacturing technology," sometimes known as the "Houck Drainage System," a system of bundled media surrounding drainage lines that is buried as a substitute for a traditional gravel drainage systems. In the course of his business, Michael Houck obtained a number of patents covering certain apparatus and methods

---

[2] As noted above, the APA included Michael and Wanda Houck, and their company, EEE ZEE Lay Drain Company ("EZL"). The latter is not a party to this arbitration, and for ease of reference, the property previously owned by, or any obligations of the Houcks' company, will be referred to collectively as the "Houcks".

for the construction and installation of these drainage line units. As acknowledged by the parties, the APA is not a patent license agreement. Rather, it involved the acquisition of assets of the Houcks, as well as certain Patents (defined in the APA), manufacturing technology, and related Intellectual Property (defined in the APA).

**The Asset Purchase Agreement**

The APA called for the sale of all manufacturing equipment, furniture, furnishings, and other items of "tangible personal property" used in connection with the Houcks' operation, including: all inventory of Products held for sale in the ordinary course of business, including work in progress; all customer lists, price list; etc.; all legally transferrable permits or approvals pertaining to the Products; rights to the name, and certain scheduled equipment.

By separate paragraph (¶ 2.2), Michael Houck was obligated to transfer all right, title, and interest in and to the Patents, as well as his rights to the Blowing Machine patent application that was pending at that time. Paragraph 2.4 sets forth the purchase price and payment terms for the Assets. Under ¶ 2.4(a), Respondent must make a $7.0 million cash payment, the majority being allocated to Michael Houck in payment for "Blowing Machine and Manufacturing technology" ($6.39 million). A separate provision of the section on payment terms specifically provided that in consideration for the Patents, an Installment Portion of the purchase price would be paid. Under ¶ 2.4(c), the Purchaser was to pay Houck a monthly payment of 4% of Net Sales (as defined in the APA) for a term of eight years from the Closing Date. Thereafter, for an additional ten years, the Purchaser was to pay Houck 1% of Net Sales. These were to be made in monthly payments, and interest was to accrue "at 18% per

annum (1.5% per month)" for payments "not made by the 40th day after the end of each calendar month, provided Houck [gave the] Purchaser written notice on or before the 30th day that an installment was not timely received."

The contract (¶ 2.4(c)(iv)) also provided for annual reports from an independent CPA, certifying the total Net Sales for the preceding year, and allowed for Mr. Houck to obtain a second professional opinion or audit conducted by Tom Franks, CPA, or other acceptable professional. If the second opinion or audit reflected an underpayment, the Purchaser was to remit the difference, including interest of 18% annually, and also pay a reasonable auditor's or accountant's fee if any underpayment exceeded 2% of the amount "determined to be properly payable." There also were minimum payments to be made to Mr. Houck during the first five years, ranging from $500,000 in year one to $665,500 in year five.

Matters went forward largely without dispute for most of the first eight years, and although Mr. Houck testified that on one or two occasions, he contemplated questioning some aspect of the annual calculation of Net Sales, he did not pursue it.[3]

---

[3] In 2005, Mr. Houck asked his accountant, Thomas Franks, to inquire into the Net Sales calculation. Mr. Franks sent a three-sentence letter to the Chief Financial Officer of the Ring Company, mentioning Michael and Wanda Houck, but not otherwise citing to the APA or any other provisions or references, requesting copies of "computations, any tax returns from where this income would have been derived," as well as copies of "your financial statements and audit reports," and similar general statements. Respondents' witnesses testified that they had no record of receiving the letter. Mr. Franks' copy of the letter is unsigned, and although he testified that it was normal practice after 60 to 90 days to send another copy of the letter stamped "Second Request," he produced no record of that being done. Thereafter, the request was not pursued by Mr. Franks or by Mr. Houck, and the latter testified that notwithstanding frequent communications with Mr. Carl Ring during this time period, he never mentioned any request for information on the calculation of Net Sales under the APA, nor did he make any inquiry about conducting an audit.

What appears to have triggered the commencement of the dispute was EZflow's notice to Mr. Houck that in a separate arbitration involving a somewhat similar agreement with Mr. Houck's brother (who also owned various Patents in drain field technology, and had sold to EZflow) certain non-compete provisions in the contract had been declared unenforceable by that arbitration panel. The APA contains similar provisions, and EZflow advised him that in light of the provisions being held unenforceable in his brother's contract, EZflow would no longer seek to enforce them in his contract, thereby allowing him to proceed to handle a new invention he had been working on in any way he saw fit. In response to this news, on December 16, 2008, Mr. Houck sent a lengthy email to Carl Ring threatening legal action, and suggesting that he be paid an additional 1% (the Houcks' payments had dropped earlier that year from 4% to 1% of Net Sales) "to shut all these problems down so we/you can get back to work." Matters became worse in June of 2009, when Mr. Houck learned from Ring that Infiltrator, a company that Mr. Houck described as his "worst enemy," had purchased the interests of Ring Industrial Group, LP in EZflow. Although neither of these developments are directly related to the present dispute, they seem to have triggered its commencement.

The present dispute, however, is an argument over the scope of payments due under the percentage of "Net Sales" provisions of the APA. In particular, this dispute involves the definition of the term "Products" which form the basis for Net Sales calculation. Specifically, the APA defines the key terms in dispute as follows:

> **§ 1.9 "Net Sales"** shall mean the gross sales price (inclusive of Freight) in a normal arms-length transaction to a bona fide purchaser for value for all Products sold, licensed or otherwise transferred by Purchaser or any affiliate or licensee of Purchaser, less any allowances for cash discounts, other

> trade or quality discounts, credits for return to stock, credits given under warranty, credits given for replacements, credits or write-offs due to bad debts after commercially reasonable collection attempts and, if separately stated, any sales, use, excise, value added or other similar tax levied on the gross sales price of the Products.
>
> **§ 1.12 "Products"** are those tangible items of personal property which may be manufactured, marketed, sold or installed utilizing the Patents to be conveyed hereunder by Sellers.

The Houcks' primary contention is that the relatively standard, or modified standard, male-to-male "couplers" that are used to connect the Houck drainage units in the field, should be included in the definition of Products, such that installment payments should be made on the gross sales price of those items. Claimants also contend that, in addition to the couplers, installment payments should made on "barrier paper or fabric," "pre-treatment systems," as well as additional freight charges.[4]

Both parties asserted that the terms of the APA are not ambiguous, and that this dispute required only contract construction by the Panel, not the introduction of parol evidence. At various times during the hearing, however, both parties referred to and elicited testimony regarding the history of negotiations, the history of the

---

[4] As quoted herein, the APA definition of Net Sales is defined as being the gross sales price, inclusive of Freight. Freight, in turn, is defined as the cost of transportation paid for or incurred by EZflow to transport Products to customers. During the course of the analysis of historic Net Sales payments, Mr. Franks determined that while Respondents had been paying a percentage of the primary freight charge, as called for in the agreement, a separate fuel surcharge had been added to the freight costs. This additional charge had been given a separate accounting number, and had not been tracked and included in the payments being made to the Houcks. After it was discovered, Respondents tendered payment for a calculated additional freight charge amount, going back three years (based on the three-year statute of limitations for contracts under North Carolina law, specified as controlling in the APA). In this proceeding, Claimants seek those additional freight charges for previous years where applicable as well.

relationships between the parties, and the impact of the business model and the nature of the items sold on the definitions and interpretation of the agreement. The Panel heard such evidence in the context of North Carolina General Statute § 25-2-202, as evidence explaining or supplementing the undisputed terms of the contract by showing course of performance, course of dealing, or usage of trade. In so doing, the Panel is not hearing the evidence to vary, add to, or contradict the terms of the agreement; rather, evidence of the negotiations in the formation of the contract, the circumstances surrounding the parties at the time, and similar evidence was received as an aid in interpretation.

The Panel notes specifically that its findings herein with regard to the interpretation and definition of the term "Products," the application of the phrase "utilizing the Patents," and construction of the APA generally, are based upon the Panel's interpretation of the contract terms, informed by the parties' course of dealing, and the general circumstances brought forth during the course of the hearing, including reference to the Patents. The specific interpretations espoused by the parties' respective witnesses, including Mr. Lloyd and Mr. Houck on the Claimants' side, and Messrs. Koerner, Garner, and Ring on the Respondents' side, as well as Respondent's expert, Mr. Warren, while all interesting, are not the basis of the Panel's findings. Rather, the overall context in which the contract was drafted, the use of other terms within the body of the contract, and the testimony regarding the products being manufactured at the time of the negotiation of the contract, all add context to the plain meaning of the words and the interpretation of the referenced Patents in that context.

**Definition of Products**

Both parties quote the same provisions as supporting their particular interpretation of the contract. With the definition of Products, the problem arises with the application of the word "utilizing" which modifies "the Patents." The Patents are specifically described on page 3 of the APA. During the course of this dispute, the parties have alternatively argued for and against a disciplined analysis of the scope of the particular Patents, depending upon the issue at hand.

The parties emphasized throughout their briefing and at the hearing that the definition of "Products" is not ambiguous, and it is therefore improper to define the term by reference to parol evidence. As a result, the Panel has looked first to the APA as a whole, seeking to construe that document in a manner that gives meaning to the terms in the context of the parties' relationship at the time, and internally within the document.

The Patents are a key part of the agreement as explained by Carl Ring, Ring Corporation's board chairman. The Patents were important, to evaluate what the company was purchasing and whether it could protect its investment. The APA, after being restructured as an asset purchase rather than a licensing agreement with royalties, divided the payment into two distinct parts. As described above, the section of the APA covering purchase price and payment terms specifically divided the cash portion from the installment portion of the Purchase Price. The Cash Portion included all equipment and present inventory, as well as the Blowing Machine and "Manufacturing technology" (the latter term is not defined). A separate subparagraph covered the Installment Portion, specifically stated "as consideration for the Patents."

(APA ¶ 2.4(c).

The Patents are specifically defined in Paragraph 1.10. The key phrase within the definition of Products is the requirement that those tangible items of personal property may be manufactured, marketed, sold, or installed "*utilizing* the Patents *to be conveyed hereunder by Sellers.*" The Panel has considered carefully the extensive briefing, argument, and testimony on the nature of the business, the methods of installation, the marketing and sales of the products, the items typically used in conjunction with installing the drainage units, and similar information. At its core, however, the Panel finds that in the overall context of the contract, the use of the term "utilizing the Patents to be conveyed [under the APA]," must be given a specific meaning that relates to the scope of the particular Patent itself. Otherwise, the meaning is not only subject to multiple interpretations and arguments (as demonstrated by the briefing in this proceeding), but would also be subject to constant reevaluation as new peripheral items were added, invented, or suggested in order to enhance the ability to sell the products and technology that were originally purchased from the Houcks. As such, the Panel concludes that in order for a sales item to be included within the calculation of Net Sales, it must be an item that is protected by the scope of the claims of the Patents that are the subject of the APA.

Applying that finding to the peripheral items sometimes sold with the patented drain field units, the Panel finds that none of the claimed items – including the couplers, barrier paper or fabric, peripheral pre-treatment systems, elbows, "Tees," or similar items are covered by the Patents, and therefore none of those items are properly considered as a component of Net Sales under the contract.

While this finding resolves most of the issues, there remains the question of the freight charges, including the supplemental fuel surcharge that was added sometime between 2000 and 2005.[5] According to testimony at the hearing, Respondents have already tendered a check for the additional installment payments calculated based on the fuel surcharge for the three-year period prior to the Demand for Arbitration. Claimants contend that they are entitled to the fuel surcharge back to the beginning of the agreement (or back to whenever that fuel surcharge was begun).

In response to all of Claimants' claims for additional installment payments reaching back to earlier years, Respondents raised defenses of laches and waiver, and statute of limitations.

**Waiver/Laches**

Claimants argue that even if the Houck's failure to request an audit for approximately eight years of contract operation may be considered a waiver of the conduct of an audit in a particular year, it should not be interpreted as a waiver of the Claimants' rights associated with breach of contract, if non-compliance with the contract provisions is found. The Panel agrees. While the conduct of the Houcks does not demonstrate diligence in following the Respondents' performance under the contract until recent years, the Panel does not find that the lack of diligence constituted a knowing waiver of rights under the contract. As a result, the Panel's finding has not been limited in any way as to the Claimants' rights based upon the argument of waiver or laches.

---

[5] Testimony at the hearing was not clear on this point, but Mr. Koerner testified that the fuel surcharge was added a couple of years after he arrived at the company, which was in September of 2000.

19449145.1                                     10
Case 1:11-cv-00195-MR-DLH   Document 1-1   Filed 08/05/11   Page 10 of 15

**Statute of Limitations**

The impact of the statute of limitations on the claims, however, is not so easily avoided. Claimants argue the elements of equitable estoppel as blocking the bar of the statute of limitations. However, that doctrine requires conduct that amounts to a false representation or concealment of material facts, an intention that the conduct will be acted upon by the other party, and knowledge of the real facts. (Claimants' post-trial brief at 18.) Claimants assert that Respondents lulled the Houcks into believing they were timely and properly paid. The evidence at hearing, however, does not lead the Panel to the conclusion that information was intentionally hidden from the Houcks. To the contrary, some of the evidence by which Respondents were criticized – such as the annual reports not constituting a CPA's "certification" under the specific terms of the contract -- were apparent from the reports submitted, and could have been questioned by the Houcks at any time.

Nor does the Panel find that the Respondents' error with respect to the freight payments demonstrates some ongoing motive or deception. The circumstances surrounding that error were explained as involving fuel surcharges that were added to the system using a separate accounting code, and were not reconciled as appropriate for inclusion in the "Freight" accounting code until later. While the Respondents' explanation is criticized, the Panel did not hear evidence to the contrary.

Respondents limited the tardy payment of freight charges to three years, based upon the statute of limitations. While one might find that limitation disappointing, in light of Ring's acknowledgement of the error, the Panel concludes that Ring was within its rights to limit the payment because of the North Carolina

statute of limitations applicable to breach of contract. Given the deterioration in the relationship between the parties that existed by that time, and the likelihood that any concession by Respondents might be argued against them on other issues that remained in dispute, one can better understand the decision to limit the freight reimbursement to the period prescribed for recovery of those amounts.

Finally, Claimants' assertion that this falls within the exception of a party that could not discover the misconduct of the other party is belied by the events that brought us to this hearing. It was in fact the very audit process described in the contract, once finally initiated by the Claimants and pursued through early disputes over scope, that revealed the information that Claimants now cite in support of their case. There is nothing to suggest that a diligent pursuit of an audit process in earlier years would not have revealed the same details about the freight charges (or for that matter, the other items) as were revealed in the current proceeding.

**Findings and Conclusions**

The Panel's findings as to the facts of this matter are discussed in detail within this Award. Based on those facts, and as recited above, the Panel concludes the following:

1. The Panel concludes that the phrase "utilizing the Patents to be conveyed hereunder" as used in the definition of Products in the Asset Purchase Agreement, should be construed as limited to tangible items that are covered by the Patent claims.

2. The Panel concludes that the male-to-male couplers, which are available as standard items or as items manufactured by EZflow, are not items "utilizing

the Patents" for purposes of being included within the definition of Products under the Asset Purchase Agreement.

3. The Panel concludes that barrier paper and fabric, pre-treatment resale items, and other connecting components such as elbows, tees, and similar items are not items "utilizing the Patents" for purposes of being included within the definition of Products under the Asset Purchase Agreement.

4. The Panel concludes that the Claimants' claim for reimbursement of the applicable contract percentage of the fuel surcharge as "Freight" charges is not barred by the doctrines of waiver or laches.

5. The Panel concludes that the three-year statute of limitations for breach of contract bars any claim for additional installment payments based upon the fuel surcharges as Freight charges earlier than three years prior to the date of the Demand for Arbitration. (North Carolina General Statute § 1-52(1).) The Panel finds that the equitable exceptions to the application of the statute of limitations do not apply under these facts.

6. The Panel concludes that no additional sums are due from the Respondents to the Claimants as a result of these findings, and likewise there is no obligation for Respondents to pay any of the Claimants' auditor's or accountant's fees pursuant to Paragraph 2.4(c)(iv) of the APA.

7. Any other claims for any damages or reimbursements by the Claimants against the Respondents are denied. Any other claims for declaratory relief, interim relief, or other declaration regarding the audit process or otherwise contained in the original Demand or in the Respondents' original Counterclaim, to the extent not

addressed in this Order, are dismissed as moot.

8. The administrative fees and expenses of the American Arbitration Association shall be borne equally by the parties. The compensation and expenses of the Arbitrators shall also be borne equally by the parties. The parties will be provided with a breakdown of fees, expenses, and arbitrator compensation, and the allocation of such, under separate communication from the AAA.

This Award is in full resolution and settlement of all claims submitted and presented to this Arbitration. All claims not expressly granted herein are hereby denied.

_____
David M. Leonard, Arbitrator
Dated: July 6, 2011

_____
Taylor Tapley Daly, Arbitrator
Dated: July 6, 2011

_____
Joseph R. Manning, Arbitrator
Dated: July 6, 2011

STATE OF GEORGIA

COUNTY OF FULTON

    I, David M. Leonard, hereby affirm upon my oath as Arbitrator that I am the individual described and who executed this instrument, which is my Award.

    This 6th day of July, 2011.

                                                          David M. Leonard, Arbitrator

STATE OF GEORGIA

COUNTY OF Fulton

    I, Taylor Tapley Daly, hereby affirm upon my oath as Arbitrator that I am the individual described and who executed this instrument, which is my Award.

    This 6th day of July, 2011.

                                                          Taylor Tapley Daly, Arbitrator

STATE OF GEORGIA

COUNTY OF _____

    I, Joseph R. Manning, hereby affirm upon my oath as Arbitrator that I am the individual described and who executed this instrument, which is my Award.

    This 6th day of July, 2011.

                                                          Joseph R. Manning, Arbitrator